I'm pleased to be court today to cite the federal defenders on behalf of the felon, Mr. Serrano. I'll try to reserve a minute for rebuttal. Sure. Multiple erroneous rulings covering discovery, admission of evidence at trial, and instructions cumulatively deprive Mr. Serrano of the right to present his defense of entrapment, analogous to the reversible error in United States v. Steven. There were multiple rulings which are detailed in the open brief. But in the short time that I have here, I would like to focus on what I feel is the most obvious and egregious misruling, which was the limiting of the testimony of defense witness Huerta and the total exclusion of witness Dino. I'd like to start out by pointing out that erroneous exclusion of important evidence is a particularly important error. As the Court said in Stever, the substantive standard is more forgiving or, excuse me, the case law makes clear that erroneous exclusion of important evidence will often rise, often rise to the level of a constitutional violation. And that's exactly what we have here, the erroneous exclusion of highly important evidence for the entrapment defense. Sotomayor Well, the first of these people, what, was a former girlfriend or something who said that the judge said, well, that's just a different circumstance. It's not illuminating. What's wrong with that? Gershengorn Yes. He said that threats and intimidation against a girlfriend is different from threats and intimidation against Mr. Serrano and, therefore, that it was more prejudicial than appropriate. Now, frankly, I don't understand that ruling because it's as if he's saying that somehow threats against an intimate in a domestic situation aren't that serious and that it's more prejudicial to bring it in than appropriate. Kagan Well, he's just saying that the motivations are different and it's just not very illuminating as to whether he's going to threaten in a business transaction, which doesn't sound so crazy. Gershengorn Well, I would disagree with you, Your Honor. I think that, as a matter of fact, because the testimony didn't get into that area, we don't really know what the nature of the threats were, what he was actually saying. So the fact that they had an intimate relationship may or may not be indicative and certainly doesn't seem to distinguish it to me. Kagan Did you proffer precisely what she was going to say? Gershengorn No, Your Honor. I looked for that. But the problem here was because this was someone that was learned about in discovery that was turned over on the first day of trial. Defense was scrambling to locate this person, let alone interview her. Kagan The girlfriend you're talking about? Gershengorn Yes, that's correct. This was very late discovery because the prosecution had delayed and delayed in turning over discovery about the informant. Kagan But she was there and ready to testify, correct? Gershengorn That's correct. She was there. Kagan And presumably somebody had spoken to her. Gershengorn Correct. Kagan And presumably had learned what she was going to say and could have said precisely to the judge what it was that she would have said. And that's true with both Deno and Heritage. And Heritage testified, correct? Gershengorn She did. She did under the restriction that the court imposed that there be no discussion of threats of intimidation. Deno was excluded completely for the reason, well, for the reason the judge said it was cumulative. Cumulative testimony instead of being excluded. Kagan Well, it's not. I mean, if you read that testimony, it's not clear that he was saying her testimony was cumulative as opposed to open-ended and we're just hearing about her. If you read that testimony, not the testimony, the colloquy, it's not clear that he's saying Deno was cumulative. Gershengorn Well, I disagree. I think he says that this is going to be cumulative. It's getting more into the discussion. Kagan Well, cumulative about his being a bad guy, his criminal record. And that would have, in fact, been cumulative because there was very much testimony about his background and the bad things that he had done. So that would have been, you're not arguing that that wouldn't have been cumulative. Gershengorn I'm arguing it would have been more evidence of Joseph's criminality, but that was not the reason it was being proffered. It was being proffered to show his modus operandi in getting other people through threats and intimidation to engage in drug trafficking. Kagan But again, you didn't explain with respect to Deno what it was precisely that she would have said. Gershengorn No, Your Honor. I'm not aware of what specifically she would say was the nature of the threat. Kagan Which would have been important, to your point, to raise that and explain to the judge how clearly this would have been relevant evidence, correct? Gershengorn Not necessarily. I'd say that what is pertinent, what is crucial here, is the fact that the MO of using threats and intimidation, there may be different things. I mean, certainly it could be if you're in an intimate relationship, maybe there's other things you know about this person. Kagan But the second witness proffered was not in an intimate relationship. Gershengorn No, not at all. Kagan And what do we know about what she would have said? Gershengorn Again, all that we were able to develop from the record and all that I'm aware of is just simply that she also would testify that he used threats and intimidation to get her. Kagan How was she related? What was her relationship to him? Gershengorn I can't say, Your Honor, because there's nothing in the record about this. I wasn't the trial attorney. I can't. Kagan But the one thing that doesn't make the district court then said, oh, well, I've already ruled in the other instance, but really that's not the same thing as far as we know. Gershengorn No. That's why I agree, Your Honor. It's not the same thing. It was neither cumulative, not for the purpose for which it was offered. And it certainly couldn't have been because, as the judge said, for the same reasons I just said. Kagan We don't have any reason to think that was an intimate relationship. Gershengorn No, no. There was no dispute about the fact that they were not in an intimate relationship. And, therefore, she was exactly like Mr. Serrano, somebody who was a stranger to him, who was not an intimate relationship. Kagan We don't know. The answer is we don't know, I mean, what her relationship was. Gershengorn Well, I know that that much was proffered to the court. That the defense proffered that she is not in an intimate relationship because they said, look, this is a very person who answers your concern about Witness Huerta. Here's somebody who is not an intimate, and defense even made that argument. So they at least made that representation. I don't know what on basis because, again, I wasn't the trial attorney and nothing was put on the record about the specifics of it. Kagan There were also some tapes, right? Gershengorn There was one tape of one telephone conversation. Kagan Well, there's some mention of this uncle, something about his uncle. But not as a threat. His uncle wants the drugs, but no actual threat. Gershengorn No actual threat saying that he's going to come get you. But if I could just – I'll read the passage. It's very short. I mean, just the relevant passage says, this is Joseph, the informant, speaking. Listen, I'm going to ask you if you have, like, any other shit because my uncle really liked it and he wants to know if you could do, like, a trade. And then later on he again refers to his uncle in Spanish. And then he says, he says, so he wants to trade. He wants more. Now, no, that's not a direct threat that he's going to kill you if you don't do this. But the point of that, that's not necessary. Implied threats are sufficient. Kagan Well, unless you – but the problem is this. Without the corroboration, some kind of corroboration, we have Serrano's testimony that there was a mafia or some kind of organized crime uncle. But that's all. There's no other proof that there was such an uncle. I mean, that there was an uncle who was a dangerous guy or a threatening guy. Nothing that's in this record, no, Your Honor. Nothing that was allowed in. That's exactly right. But that's why – Well, there's nothing that was not allowed in either. I mean, there was no – Well – No, nobody was proffered who was going to testify that there was really a dangerous uncle. Well, Your Honor, I did submit Morphine's – Joseph's sentencing transcript for judicial notice, in which he tells the court that there were some very scary people that he was – How do you take judicial notice of that? You're taking judicial notice of the truth of the fact that his lawyer says something about there being scary people? That's not the type of material that's subject to judicial notice. The transcript itself is subject to judicial notice. All right, but then you're asking us to take it for its truth, what his lawyer said about these people being involved. I think like any transcript that would be for the court, the court can look at it and say, would an attorney – these are representations that are being made to the court and that were being accepted by the court as part of the sentencing, that you can consider them for whatever weight that you think they're entitled to, but that it is judicially noticeable. And here, the defense attorney is representing that he's very scary people and that he was running drugs for free in order to make up for a loss of – Well, so what? Where does that take you? That shows us that he was indeed evidence that he was involved with some very scary cartel people because of the amount of drugs that was involved. That's not something a freelancer would be involved with, not 10, 12 pounds of methamphetamine. But what does that have to do with the entrapment defense? What that shows is that it shows the scope of what could have been elicited if the court had not unfairly limited the investigation. We have no idea, but you weren't – I mean, the whole problem here, the whole oddity of this case is that Morfin didn't testify. Yes. And the defense never – I gather the defense met with him and didn't try to call him. He was interviewed over a lunch hour in the middle of trial. Right. And nobody has indicated whether he was taking a fifth or what was with him. Right. No. But – There's nothing – the judge's point is there's nothing in the record that disputes the fact that the defense could have called him as a witness. The defense could have called him except that it seems substantially more likely that he was called by the defense that he would have invoked since he was in the middle of his own criminal case. And it is no more acceptable for the defense to call a witness, which they suspect is substantially likely to invoke his Fifth Amendment rights, than it is for the prosecution. The point of this is, is that this was someone who was uniquely in control of the government, somebody who the government had been using for years. But you had access to. They gave you a name and address. You had that information four weeks before trial. He was there. You could speak to him. That's correct, Your Honor. But there was no duty on the part of Mr. Serrano to call the prosecution's star witness to the stand in order for him to testify. And there's no argument, I gather, that he was, I don't know, indicted in order to prevent him from testifying or anything like that. No. But because of that – the problem was that this happened months before the trial. Were there any requests that he be given immunity so he could testify? No. In other words, ensure the defense didn't want him to testify. No interest in him testifying. That's correct, Your Honor. And so, but despite the fact that the witness couldn't, could be called and might have invoked or wouldn't have said anything to anybody and he would have just sat there and just sat back down again, one is that the requirements of presenting the defense then at least require that the court give some latitude to getting into the actual statements that went on, the actual interaction. Do you want to briefly discuss your entrapment as a matter of law argument? Sure, Your Honor. I think that – I mean, the problem with everything else is that it's so amorphous because we don't know what anybody would have said or how they were connected to anything. It's just very difficult. Well, I think the evidence that's in the record undisputedly shows that both that there was inducement as a matter of law and that there was no predisposition as a matter of law. Well, the predisposition seems relatively straightforward. I mean, if you accept the fact that, you know, the fact that he hadn't apparently dealt drugs for many years. That's right, Your Honor. I think you can go through each one of the five factors in Thomas and Girola. Each one of those clearly lines up in favor showing there's no predisposition. But what about the inducement question? The inducement has to be other than asking somebody to sell drugs. Yes. I think there's a case just like Sherman, and it's just like Skerry. Sherman was a case where the Supreme Court said there was improper inducement where one drug addict used sympathy in order to get another drug addict to buy some drugs for him. Now, it wasn't completely altruistic because the defendant also shared the cost and used the drugs as well, so he wasn't doing it altruistically out of sympathy. But if sympathy is an improper inducement, what Joseph here did was arouse a dormant craving for cocaine, an addiction craving, and use that to reel in Mr. Serrano. How do you know? Is that undisputed? This issue of predisposition went to the jury. Not of predisposition, I'm sorry. They both went to the jury. But the jury found there was no inducement. That's correct. But interestingly, that's what most of the evidence that was excluded by the judge went to. Dina and Huerta both went to the inducement. Most of the discussion that was kept out as hearsay, that was Mr. Serrano's discussion of his interactions with Joseph. Well, but he got out that testimony. I mean, there are numerous instances throughout the transcript where he talks about, I was scared of the uncles coming over to my house to where I live, possibly putting my family in danger. I was concerned for my safety. He talks about, I couldn't brush him off, talks about the fact that he made a number of phone calls to me. There are numerous portions of the transcript where he gets all of that testimony out. That's true, that some of it did come in. But I would say this is just like Davis v. Alaska, where the Supreme Court said the fact that there was some limitation, that some cross-examination was allowed, doesn't preclude the fact that the limitations were nonetheless impinged on the constitutional right to present a defense. And that's what I believe happened here. Especially when you see the government argues there was no corroboration of these threats at all in the record. But that's only because they were kept out by the district judge. But even with regard to the predisposition or other inducement issues, i.e., this notion that he was harassing him and repeatedly trying to get him to use drugs and all that, all of that is still only your client Serrano's testimony, right? Again, the absence of Morphin makes this case very odd. So what do we know other than what Serrano said? The jury could have just disbelieved Serrano. They could have just said, I don't believe him. So without that, what do we know about how all this came about? Well, I mean, we have absolutely nothing, then, if we don't accept it, because there's no testimony about it. But I do point out that the government never disputed the fact that Morphin sold this cocaine, that he brought illegal drugs. He offered him first meth. But how can you have entrapment as a matter of law when the only ‑‑ if the only evidence that supports it is Serrano's testimony and they could disbelieve him? The jury can disbelieve him if it's reasonable to do that. They can't simply say, we don't like criminal defendants. No, they can say, you know, he has a story, but we don't have any basis for corroborating that Morphin even said these things to him. So we're not going to believe him. It's not corroborating, but it's also not disputed at all. And the government actually argued to say that they actually made the argument that, look, he is criminally predisposed because of the fact that, look how quickly he agreed to buy this cocaine, that he must have been using drugs before, even though all the people that knew him saw no signs of that fact. So that was corroborated. The fact that he wasn't using drugs in the past few years was corroborated by people who knew him. It was corroborated by the character witness. That's right, because they didn't see any signs of this, that he was functioning properly, he wasn't selling or using drugs. The roommate's girlfriend who had the run of the house on a daily basis never saw any signs of drugs or anything like that. So at least there was corroboration in the sense that there was an absence of any evidence. That didn't keep the government from arguing, nonetheless, that he must have been using drugs because he was so quick to accept their informant's offer, their informant's improper inducement. But once he was induced by the offer of the drugs, the reawakening of that addiction craving, then that's where the threats kick in to continue, for him to continue to comply, where you start saying, you know what my uncles are about. You know what my uncle's about. You know, I'm not one of these people that constantly quotes from the Godfather. I definitely don't want to do that, but one of my colleagues pointed out there is a line from the Godfather where one of the gangsters says something completely innocuous to someone, something like, you've seen me in this neighborhood before. But in the context, everybody knows what that means, that it's a threat. So something that sounds pretty innocuous, like, you know my uncles, you know what they're about, that's not a direct threat, but in the context, it's a threat. And that's just as important, because none of the entrapment cases show direct threats, where someone says, I'm going to kill you if you don't do this. Even scary, the case that we cited, there were no direct threats. Well, you're not arguing duress here, are you? No, we're arguing that he felt that he had to comply. That's the inducement. And of course, Sherman and Jacobson recognized this, that coercion, it's even in the instruction, coercion and fear are improper inducements. If in Sherman, if sympathy, invoking sympathy of a drug addict is an improper inducement, instilling fear and manipulating the vulnerability of a former drug user to get them back on the hook, those have to be improper as well. If mere sympathy is enough, which may not be felt, then I think what is here is far more than what you find in Sherman. It's at least equal, the threats are at least equal to what you find in scary. They're indirect. But in the context, they were enough for Mr. Serrano to reasonably believe that if he didn't comply. Mr. Serrano was able to get us a fair amount of drugs, correct? The government indeed, and that's part of my sentencing entrapment, the government keeped upping the antitrust. But he was able to get it fairly quickly. In the end, he was able to. His neighbor, whom he had originally gone to because he had bought one or two Viagra pills from him in the past, was able to come up with the ecstasy. He was able to come up with the 1,000 pills, and he was able to come up with the 5,000 pills. And that's true. And this is interesting because this relates to, I pointed out in the 28-J letter, the decision in Black, where they're talking about outrageous conduct, but it's similar here. And Judge Noonan points to something which, to also a decision that Judge Posner said, is that what's the problem with these sting operations is that they're self-defeating because they create crimes where crimes didn't exist before. In this case, we had a neighbor who was willing to sell one or two Viagra to another neighbor. But then through what the government's process here, through Joseph's setup here, we've now created, we now have someone out there who's willing to deal in 5,000 ecstasy pills. The government, instead of getting somebody who was dealing drugs before and that they're shutting them down. Well, it's got 5,000 ecstasy pills off the street, right? They did. But that was those 5,000 pills. It's not the government selling drugs to someone else. It's the government that created that situation of someone producing these 5,000 pills. Well, they got 5,000 ecstasy pills off the street, correct? This is not one of those circumstances where it's the government who is purporting to sell the drugs. That's true. It's a different circumstance altogether, correct? What I would say, Your Honor, is that if Joseph Morphine had never met Mr. Serrano, these 5,000 pills would not be in circulation either. They would just be sitting there somewhere in somebody's little stash, right? They would be wherever the neighbor happened to get them from illegally. But the point of this is that there was no indication. As Judge Noonan talked about in his black dissent, what are we doing when we have a situation where there's no evidence that this person was involved in drugs before, where the government goes after somebody that they had no information about before? It's a different case if you know these people are dealing drugs. Let's try to take them down. Here's somebody that an informant goes out there trolling, casting for somebody to get so that they can maintain their contract with the government and find somebody who was not predisposed, who wasn't involved in drugs, and let's say, let's bring him down. And human weakness being what it is, you eventually will find someone to bring down. You'll offer them meth. He says, no, I'm not into that. How about Coke? Well, yeah, actually I do have a Coke edition. This seems to show that if Joseph hadn't scored with the Coke, he would have just gone down the list until he found something or moved on to someone else. He had to bring in people or his contract with the DIA would be terminated or he just wouldn't be used. He could no longer use the government as cover for his own illegal dealings. And that was his goal, get someone any way he could so that he could continue his contract with the government. And everything about Joseph that we know shows that that's the sort of person he is. And he wouldn't stop, he wouldn't scruple against using improper inducements to get someone on the hook so that he could continue as a quasi-government agent. I think I've more than used up my time at this point. Thank you. May it please the Court. I'm Michelle Pettit of the United States. As we've already been discussing this morning, the critical issue in almost every aspect of the defense's argument really relates to the threats. The defense that Mr. Morphin somehow induced Mr. Serrano into selling these drugs based on threats. I think it's very significant, especially if you... That's one argument. The other is he induced him by offering drugs to an addict. Correct, Your Honor. And I think the critical one is really the threats when you make the comparison of the evidence that was presented at trial. This was obviously a vast amount of evidence that came into this case. And it came in in different stages. And you have to look at the record of trial as a whole, because initially, there was no prima facie case. But in fact, from the government's end, because they didn't put on the seller or the agent, there wasn't really much evidence with regard to the actual interactions that led to the sale other than Serrano's own testimony. And so the vast amount of evidence was not really related to the entrapment defense. Correct, Your Honor. I would say it still relates to the entrapment defense, but your analysis is correct. Most of it came... The government tried to put on... Where's the burden of proof on this? Say again, Your Honor? Where is the burden of proof with regard to the entrapment defense? Well, the government... Once Mr. Serrano's defendant did provide a prima facie showing of entrapment, then it shifted. And there was actually a point in the record of trial where I was the trial counsel on the case, and we had a discussion with the judge about whether or not the burden shifted. The burden did shift. It was my burden to prove that there was predisposition and no inducement. Once that occurred... So how did you prove that? Well, Your Honor, I think... Or why isn't the evidence... Why wasn't there at that point entrapment as a matter of law? There wasn't, Your Honor. If you look in Sherman, for something to be entrapment as a matter of law, there has to be no conflict of witnesses and no judging of credibility. This case was all about the judgment of credibility and the conflict of witnesses. What the appellant has not discussed... You have to prove that there was no inducement. Correct. And no predisposition. How did you do that? What was the evidence that there was no inducement and no predisposition when you didn't put on the informant? There was controversy between Mr. Serrano's testimony and Mr. Cruz Navarro. The jury would have to believe one or the other. They could not have believed both. There was no threats that Mr. Cruz Navarro ever observed. The only time he had heard a threat from Mr. Serrano, his co-defendant, was when they were in jail in a self-serving statement by Mr. Serrano. So we did have a precipient witness throughout this entire process. Well, he wasn't precipient to everything. He was precipient to a little of it. He was precipient to a lot, Your Honor. And we also have the call that we discussed earlier here in court, that the call that, of course, on the record, all you have is the written transcript of that call. But what's significant is the jury heard that call. I played that call for the jury. They heard the voices. They heard the intonations. They heard exactly how Mr. Serrano responded to that call and how the source talked to him. And that's something that the jury could judge, whether or not they thought there was a threat. Additionally, they got to judge the mannerisms of Mr. Serrano on the stand. Just like when I had to make the judgment call after hearing his testimony if I was going to present Mr. Morphin. And after hearing Mr. Serrano testify, I made the call not to, because the testimony was so incredible. And it wasn't just what he said. It was how he said it. It was his mannerisms, his reactions to the questions. And I think the jury picked up on the exact same thing that I picked up on and therefore made some strategic decisions in trial, that it would not be beneficial to present any more evidence with Mr. Morphin. Counsel points out, though, that there was important evidence that was excluded. When Mr. Serrano went to offer testimony about what Mr. Morphin said to him, the government objected on the grounds that that was hearsay. That seems to me to be an improper objection. And the court in part sustained that. Do you agree now that you shouldn't have objected on those grounds and the objection should not have been sustained? Yeah. I think we made a lot of hearsay objections that I think should have been sustained. But I think at hindsight, going back and reading through the record, anything that was a direct threat from Mr. Morphin to Mr. Serrano based on Mr. Serrano's testimony should have been allowed in, and it was. The court did make a finding that if it was a statement that was considered to be a threat, that that would be able to come in, and it did. Why wasn't the jury entitled to hear Mr. Serrano say exactly what Mr. Morphin said to him? That was the whole part of his defense. It's how this guy tried to talk me into things. Why shouldn't the jury have been permitted to hear the exact words that were said to him? They were, Your Honor. If you look on page 547 of the ERs, I believe that's the right reference. He actually was allowed to make that statement. He actually provided the statements that he considered to be the threat. In looking at all the transcripts, I think that's probably the best location at the bottom of page 547. Well, he eventually was able to get it out. Correct. Do you want to read that? Absolutely, Your Honor. He said, and this is Mr. Serrano's response to what else would he tell you. He would say, hey, man, have you got that stuff? My uncles are waiting. They've got a shipment going up north. They've got a spot for you in the car. They're just waiting for you, man. When are you going to get me that stuff? Things of that nature. And who said that? That was Mr. Serrano. That was the actual statement of the appellant. So even though you did make objections that were stained, ultimately he was able to get the testimony out. Yes, Your Honor. And you agree now that the objections were incorrect and should not have been sustained. Yes, Your Honor. The specific objection as to the threat should not have come in. The problem was the way the testimony was coming out with Mr. Serrano was when he would be asked a question, his immediate response was, well, we were talking and I said and he said. And a lot of that was background and it was all hearsay. So I was making a lot of objections on hearsay. Well, if it's not being offered for its truth, it's not hearsay. Correct, Your Honor. But it was hard to tell what was and what was. So for that reason, we were making several objections. But when the court really got to the heart of it, it was what was the threats given to Mr. Serrano that would be relevant to the defense. All of that came out. Well, Howard said Dino's testimony, which was not permitted to come in. The defense says, We want to talk about the way Mr. Morphin got Ms. Dino involved in this offense. But based on the district court's ruling with respect to Ms. Earl, we're going to limit the questions in the same manner. We'd like to get more into the facts of how he involved her. And we just want to make a record that we have a similar request to Ms. Dino. So apparently Ms. Dino was going to talk about how she became involved in this offense. So why isn't that directly relevant, including any threats that were made to her? Are you asking her, are you interpreting this to mean that she was involved in this offense, the offense before the court, Mr. Serrano? That's what it says. I think what they were saying, well, here's the problem. It's really hard for me to know exactly what Ms. Dino was going to say. To this day, I cannot tell you what she was going to say. Well, yes, and I was confused, too, but I just read that, which says that she was going to testify about how she became involved in this offense. Your Honor, I think that is maybe a loose wording by the defense. I have no evidence whatsoever Ms. Dino was ever involved whatsoever with any transaction with Mr. Serrano. Okay, but we have to go by the record in terms of what it was they proffered. We were all sort of a little confused about how the judge was supposed to know what she was going to, what her relationship to this was. And it says here what her relationship was. I think when he's talking about the offense, he's talking about Mr. Morphin. What I knew, the only thing I knew at the time, what was told to me by my case agent as she was walking up to the witness stand, was that she was involved with Mr. Morphin's original methamphetamine arrest that ultimately led to him becoming a source. So before he even entered in a source agreement. Well, whatever it is, it bears no relationship to the wherewithal problem. And it's a lot more close in to this issue. I mean, apparently it had something to do with how he got her to commit the criminal offense. The problem, Your Honor, is I'm not sure that it's true or not true. Because there was never proffer made on the record of how there was any threats to her or any intimidation. And I don't even know the relationship. Now, I agree, I don't have the impression, and again, these are assumptions on my part. I mean, and he was nervous about hearing from somebody, some witness nobody knows about. I mean, that's an objection to putting a witness on? Well, I think his issue is really the cumulative nature. What defense limited this? What's cumulative, too? You're standing on, you're saying on the one hand he had no corroboration of threats, but on the other hand this is cumulative. The cumulative part went to the criminal conduct or legal activity of Mr. Morphin. The court had been very clear that if Mr. Morphin did anything illegal during the contract period as he was, when he was a source. But we want to talk about the ways Mr. Morphin got Ms. Dino involved. It's not about Mr. Morphin's being a criminal. It's about how he got Ms. Dino involved. It's not very mysterious. No, Your Honor, what was, if you go back to what Ms. Hereta, what she was testifying to, how Mr. Morphin got her involved in smuggling marijuana across the border. So I think what they're saying is he, Mr. Morphin was also involved in an offense with Ms. Dino getting drugs. I don't know what exactly happened, but some kind of transaction with drugs. So I think what they're talking about, again, is criminal conduct and Mr. Morphin, how he's involving people in criminal conduct. Not in the same address. The judge says it sounds like she's going to get into intimidation. The only time, Your Honor, the only time. And for the reasons stated, I don't think that's appropriate. Why not? What were the reasons stated? The only reason stated was because the other witness was talking about a completely different kind of intimidation. And the only time intimidation comes up is the wording of the judge. The defense never proffered that she was going to talk about intimidation. Instead, they were talking about Mr. Morphin having activity in a legal manner with another person. So the problem is, is that under one of the rules of evidence, under 103, the defense had the burden to put on some kind of proffer so this court would know how to evaluate the case. The problem is, is that it is the trial court's job to make these four or three balancing tests, and they didn't have the information to do it. But that's always a problem. When you have a judge who's jumping to make a ruling, right, he didn't wait and say, well, what exactly is she going to say? He didn't say, would you please make a proffer so I'll be able to rule? He said no before anybody had a chance to do anything. Your Honor, they had a chance in the very beginning to give a proffer. As a matter of fact, when Ms. Ferretta, when we went sidebar with her, I gave a proffer to the court because I had the information, because I had just learned it and given it to defense as soon as I learned it. Ms. Dino, I had no information. So I told that to the court. I have no information. I begin no reciprocal discovery on this person. I don't know what she's going to say. The defense had the burden at that point to say, Your Honor, here's my proffer. This is what she would say. This is the relevance. Kagan. Why don't you talk about the ways that Mr. Morphin got Ms. Dino involved in the offense? Which again goes to the cumulative nature of Mr. Morphin again involved in more criminal activity, not necessarily the threat. But that's not what he said. He didn't say that. He didn't say I want to put her on to say that Mr. Morphin was involved in offenses. He said I want to put her on to say how, the ways Mr. Morphin got Ms. Dino involved. Your Honor, the defense even admits right there that they're limiting themselves to the same type of testimony as Ms. Ferretta. What Ms. Ferretta was allowed to testify to was the criminal activity that she was involved with Mr. Morphin. So the defense therefore based on that representation is telling the court that Ms. Dino was going to give the same type of testimony another event where Mr. Morphin is involved with drug trafficking with another person. They would have had to make an explicit comment to the court, a proffer to the court, that there was more threats and intimidation that were relevant to their defense. They did not do that and did not preserve that for appeal. And to this day I can't tell this court what she was going to say. And that's the problem. It's not that they weren't able to say that or to tell the court that. They chose not to. Well, the judge commented I have no clue what she's going to get into in his ruling. Correct, Your Honor. At page 664. Yes, Your Honor. And I think that's the problem. I see my time is up, but unless there's more questions. Any questions? Thank you. Thank you, Your Honor. We'll give you a couple of minutes. Go ahead. I just need to make one point. I'm just not able to talk about it. Is there any ability to make a proffer in trial of a witness who was discovered by defense investigation as a follow-up on late discovery that was disclosed on the first day of trial? You talked to her. I mean, not you personally, but the defense counsel talked to her. They did, Your Honor, but I don't know on what circumstances. They didn't tell the judge what she said. In the hallway in front of the courtroom. They maybe didn't know. They couldn't tell what she was going to say. As the court said, this is like we're doing discovery here, and indeed it was. That was something of the government and the court's own making by sanctioning the late discovery. Was there a request for an adjournment to give you more time to speak to this woman? No, Your Honor, because it seemed pretty clear that, oh, look, here, you said that we can't go into Ms. Huerta because there's an intimate relationship here. Here's someone who doesn't have that relationship. She wants to talk about threats to get involved in drug trafficking. That seemed like that was about as clear as it could be. Well, but there could have been a lot of issues. It could have been the nature of the threats, what was said, the timing of the threats, when they happened, a lot of which would have informed a ruling. And the court said he didn't say it was cumulative about intimidation. He said I'm not going to allow her to testify because there's too many open-ended issues here. It's too little, too late. I have no clue what she's going to get into. And he says to me it's cumulative anyway if it's just to show this guy was involved in criminal activity. The jury's got that. And then he said it sounds like she's going to get into intimidations, but for the reasons stated, I don't think that's appropriate. That's right. And the district court got it wrong. It wasn't being offered for the point of showing that he was involved in criminal activities. It was to show how he used his MO of getting people to induce other people to get involved and do these crimes for him. But she would have been talking about Mr. Morphin's being involved in further criminal activity. That would have been the result of her testimony, correct? Fairly, but as the court pointed out, it might have been slightly cumulative. It might have taken two or three pages and we would have heard of another crime. But it was not soiling up some spotless reputation otherwise. This was somebody, yes, we have heard of him being involved in crimes, but that's the whole point. He was engaged in a huge effort of using his official status, his quasi-official status, as a cover, a smokescreen to his own criminal endeavors. That's something the jury should have known about to the extent to see that, yes, here was someone who was likely to use improper inducements. That is corroboration of Mr. Serrano's case. The jury didn't have to just take his word for it that he was pressured into doing this. Here is somebody that is very likely to do that because he's done it multiple times. This is ordinary 404B. The defense counsel was able to argue based on Ms. Herita's testimony in summation that look at what he did to Cynthia Herita, no prior record, gets her involved with drugs. Everything he knows is wrong, and they trusted him. So you were able to at least have enough from Herita to make that argument to the jury, I take it. That's correct, Your Honor. But just like in Davis and just like in Stever, argument doesn't make up for the fact that you have nothing to back that up. In fact, if anything, argument- So it was an improper argument? No. The argument was allowed, and we're not objecting to saying that he shouldn't have been allowed to do it. But it actually could hurt as much as help because just like in Davis, the jury is sitting there saying where is he coming up with this? Where is the evidence to back up the fact that these threats? All we have is Mr. Serrano saying he was threatened. How do we know that Joseph ever did this thing? He's a government agent. Shouldn't we believe the government that he's a government agent and he's okay? That's the way that the agent Swisher portrayed it. This was just a normal sting operation. Nothing unusual about this. It's only when cross-examination started that we realized who this Joseph was and how he works and what he was doing. And we only got a part of it. We only got a small part of it, and therefore the jury didn't get the whole picture about how this crime was concocted by Joseph and carried on by the government to trap Mr. Serrano. Did you make an offer of proof at that time? No, no, there isn't one, and I don't know that one was possible because we're on the fly here. We're in a situation created by the delay in disclosing information about the informant, Joseph. The government was doing this in the middle of trial, and they did the best that they could. I'm not saying that that should be taken into consideration, that maybe they don't know what she's going to say, that we know she says threats, but we don't have an opportunity to pin that down now. Let's put her on the stand, and let's at least, the judge could say, well, instead of excluding a witness completely, let's just, let's see, and then we'll do it objection by objection. But the court decided to say, no, this is the same thing for the same reasons. I'm not letting in any sort of threat, and it's just going to muddy up this person. But that wasn't the point, and even the government perceived that. Even the judge perceived it because he says, two is not a pattern. He realized that there were, like, the defense was trying to set up a pattern of using coercion to induce criminal behavior. And, but here was the third person that would create the pattern, and the judge still excluded.  Well, here's the third person, and the judge still said no. And I just want to remind the court that, you know, Stever points out that there's a more favorable standard to apply when there are erroneous exclusions of the evidence. It's more favorably looked at that this could have been a significant error. Thank you. Thank you.
judges: Amon, Pregerson, Berzon